## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | | |
|---|---|---|
| The Cleaning Authority, Inc., | ) | Civil No. 1:10-CV-00203-JFM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Joanna Neubert, Frederick Neubert | ) | **VERIFIED AMENDED COMPLAINT** |
| | ) | |
| and | ) | |
| | ) | |
| Ashley N. Vanhook | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff The Cleaning Authority, Inc. ("TCA"), for its Verified Amended Complaint against defendants Joanna Neubert, Frederick Neubert (together, the "Neuberts"), and Ashley N. Vanhook ("Vanhook"), alleges as follows:

### THE PARTIES

1.      TCA is a Maryland corporation with its principal place of business located at 7230 Lee DeForest Drive, Suite 200, Howard County, Columbia, MD 21046, and is therefore a citizen of Maryland.

2.      Defendant Joanna Neubert is an individual who, upon information and belief, is a citizen of South Carolina residing at 20 Durango Place, Cleveland, SC 29635.

3.      Defendant Frederick Neubert is an individual who, upon information and belief, is a citizen of South Carolina residing at 20 Durango Place, Cleveland, SC 29635.

4.     Defendant Ashley N. Vanhook is an individual who, upon information and belief, is a citizen and resident of South Carolina residing at 150 Howell Circle, #254, Greenville, SC 29615.

## JURISDICTION AND VENUE

5.     This Court has original subject matter jurisdiction of this action under 28 U.S.C. § 1332, in that this is an action wherein the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.     This Court has personal jurisdiction over defendants Joanna and Frederick Neubert pursuant to Section 23.3 of the Franchise Agreement identified below because the Neuberts irrevocably consented to "submit to the jurisdiction of Maryland courts" and expressly waived any objection they may have to either the jurisdiction or venue of Maryland courts.  The Court also has personal jurisdiction over the Neuberts because they have the minimum contacts with Maryland necessary to satisfy the due process requirements of the United States Constitution independent of their consent to jurisdiction.  Specifically, the Neuberts entered a Franchise Agreement with Maryland citizens, participated in training in Maryland at TCA headquarters, traveled to and from Maryland, and had ongoing communication directed to TCA in Maryland.  This Court has personal jurisdiction over Vanhook because she has caused tortious injury in the state of Maryland and has the minimum contacts with the state necessary to satisfy the due process requirements of the United States Constitution.  In particular, the Court has personal jurisdiction over Vanhook under the Maryland conspiracy theory of personal jurisdictions as well as by reason of her aiding and abetting wrongful acts of the Neuberts, which impute to Vanhook the contacts of

the Neuberts of Maryland.  By reason of the conduct described below, Vanhook purposely directed her activities toward a citizen/resident of Maryland.

7.      Venue is appropriate under 28 U.S.C. § 1391 because a substantial part of the events giving rise to TCA's claims occurred in this judicial district and this is a judicial district in which one or more of the defendants may be found.

## NATURE OF TCA'S CLAIMS

8.      TCA brings this action because the defendants have, individually and in concert, deprived TCA of one of a franchisor's most important rights — its rights as a matter of law and as a matter of the typical franchise agreement to exploit and to protect the goodwill associated with its trademarks and system of doing business.  This goodwill includes the right of TCA to retain an ongoing relationship with customers upon termination of the Franchise Agreement between TCA and the Neuberts.  In exchange for TCA's agreement that the Neuberts could operate a franchise using TCA's federally registered trademarks, its trade secrets, and its methods of doing business, the Neuberts promised TCA that (1) they would operate the franchise for at least ten years, (2) during the operation of the franchise they would do nothing to assist any other person in the operation of any other cleaning business, (3) upon termination of the parties' Franchise Agreement they would cooperate with TCA in transitioning customer relationships to TCA, (4) for a two-year period following termination they would not compete or assist others in competing against TCA, and (5) they would not convert, or assist others in converting, customer relationships away from TCA.  Notwithstanding these promises, the Neuberts and the manager of their franchise, Ashley Vanhook, engaged in a course of conduct that had as its inevitable effect the conversion of TCA's goodwill to their own use.  This course of conduct included (1) the

Neuberts abandoning their Franchise Agreement with TCA, without cause, without any prior notice, and with five years still remaining on its term, (2) Vanhook, while serving as the manager of the franchised business, incorporating a new business she called Premiere Cleaning Services to steal TCA goodwill (i.e., its right to a continued relationships with customers) as soon as the Neuberts abandoned the franchise, (3) the Neuberts and Vanhook sending notice to customers of the franchised business (customers belonging to TCA under the terms of the Franchise Agreement and the law in general) that the Neuberts were abandoning the franchise while, at the same time, making no effort to help TCA maintain customer relationships after the abandonment, but instead identifying through a business card Vanhook's new business, Premiere Cleaning Services, (4) the Neuberts and Vanhook converting to their own use customer information that constitutes trade secret and proprietary information under the parties' Franchise Agreement and applicable law, and (5) the Neuberts and Vanhook otherwise arranging for Vanhook to operate Premiere Cleaning Services immediately after the Neuberts supposedly walked away from the business at the same location as the franchised business, using the same employees as the franchised business, and servicing the same customers under the same agreement as the franchised business. The defendants deliberately hid all of this from TCA. In fact, when confronted by TCA, the Neuberts' falsely represented to TCA that they had done nothing to organize a transfer of customer relations from the franchised business (and therefore TCA) to any employee or other third party, when in fact they had schemed with Vanhook to steal TCA's goodwill.

## FACTUAL BACKGROUND

### THE CLEANING AUTHORITY® Marks and Business System

9.      TCA is a corporation that, for more than ten years, has franchised THE CLEANING AUTHORITY® residential home cleaning businesses throughout the United States.  TCA offers a "business format franchise."  As such, it offers to its franchisees an entire method of doing business.  As is typical with a business format franchise, TCA licenses its franchisees to use a comprehensive method of conducting operations using unique methods, standards, and specifications developed by TCA and that constitute THE CLEANING AUTHORITY® system of doing business (the "System").

10.      In addition, TCA licenses franchisees to use THE CLEANING AUTHORITY® trade name, trade dress, and service marks, as well as certain other designs, phrases, logos, trademarks, service marks, and other items.  TCA is the owner of, and has the exclusive rights to license others to use, its registered trademarks, various trade names and service marks (which is on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (collectively the "Marks").  TCA has continuously used each of THE CLEANING AUTHORITY® Marks since the date of their registration, and these Marks are in full force and effect pursuant to 15 U.S.C. § 1065.

11.      TCA has at all times given notice to the public of the registration of THE CLEANING AUTHORITY® Marks as provided in 15 U.S.C. § 1111.

12.      As of December 2009, there were 180 domestic, franchised THE CLEANING AUTHORITY® cleaning businesses across the United States, operating under THE CLEANING AUTHORITY® System and using THE CLEANING AUTHORITY® Marks.

13.     THE CLEANING AUTHORITY® franchisees offer residential home cleaning services, which consist of the cleaning of the inside of a residential home similar to a maid service, featuring TCA's exclusive "Detail-Clean Rotation System." Many TCA cleaning businesses use Green Seal Certified® chemicals and HEPA vacuums and microfiber dusting cloths preferred by the U.S. Department of Health and Human Services.

14.     TCA franchisees operate their cleaning businesses using the unique and distinctive System developed by TCA, including an inherently distinctive trade dress, signage, specifications, advertising, trade practices, operating methods, various business forms, training materials, manuals, including the Manual Suite operations manual, sales techniques, and personnel management and management control systems, including the TCA's customized, proprietary business management software called "TCA.net."

**The Franchise Agreement Between TCA and the Neuberts**

15.     On December 16, 2004, TCA and the Neuberts entered into a written franchise agreement (the "Franchise Agreement") that granted the Neuberts the right to open and operate a THE CLEANING AUTHORITY® cleaning business within a specified territory consisting of certain specified United States Postal Service Postal ZIP Codes (Greenville, South Carolina; Greer, South Carolina; Mauldin, South Carolina; Simpsonville, South Carolina; and Taylors, South Carolina), through a business located at 120 Halton Road, Suite 9, Greenville, South Carolina ("120 Halton Road"). A copy of the Franchise Agreement is attached as Exhibit A.

16.     Contemporaneously with their execution of the Franchise Agreement, the Neuberts also executed a Mailer Services Agreement ("MSA") with TCA's affiliate, S&T Management, Inc., d/b/a TCA Advertising or TCA Supplies ("S&T"), to send to customers

in the territory, on the Neuberts' behalf, an average minimum number of mailers per week advertising the Neuberts' franchised business. The term of the MSA was co-terminous with the term of the Franchise Agreement and terminated immediately upon termination of the Franchise Agreement. A copy of the MSA is attached as Exhibit B.

17.     As part of the consideration for receiving the franchise opportunity from TCA, the Neuberts agreed to pay to TCA as royalties a percentage of the gross revenue they generated as TCA franchisees, as well as a national advertising fee. They also promised to comply with the terms and conditions set forth below.

**The Neuberts' Promise to Protect TCA's Goodwill and Other Interests Through the In-term Noncompete**

18.     The Franchise Agreement contained certain in-term and post-term obligations of the Neuberts designed to protect TCA's confidential information, to encourage the Neuberts to devote their efforts to their THE CLEANING AUTHORITY® business and not a competing business, and to assure at the conclusion of the franchise relationship that TCA would retain the goodwill or customer relationships attendant to the Neuberts' use of the TCA Marks and System.   One such provision was paragraph 22.1 of the Franchise Agreement.  This paragraph contained an in-term noncompete that is typical of franchise agreements generally and provided as follows:

> *In Term Covenant.*   During the Term of this Agreement, neither you [the Neuberts] nor the operating corporation nor the guarantors to this Agreement will, directly or indirectly, for yourselves or for any other person or entity, alone or through or on behalf of others, own, engage in, be employed by, advise, assist, lease or sublease to, invest in, franchise, lend money to, sell or lease the assets of the Franchised Business to, or have any financial or other interest in, any residential or commercial property cleaning business within the United States including without limitation any carpet cleaning, window cleaning or furniture cleaning business, other than as a Franchisee of ours under this Agreement (or another franchise agreement with Us).

19.     The in-term noncompete was reasonable and served the legitimate business interest of TCA in assuring that the loyalty of the Neuberts in the cleaning business was devoted exclusively to the franchised business and not a competing business run either by themselves or a third party.

**The Neuberts' Promise to Protect TCA's Goodwill and Other Interests Through the Post-Term Noncompete**

20.     The Neuberts were further obligated under the post-term noncompete in Section 22.2 of the Franchise Agreement not to "own, engage in, be employed by, advise, assist, lease or sublease to, invest in, franchise, lend money to, sell or lease the assets of the Franchised Business to, or have any financial or other interest in, any residential or commercial property cleaning business" within a 100-mile radius of their former Territory for a period of 24 months after the effective date of expiration or termination of the Franchise Agreement.   The terms of the post-term noncompete were reasonable as to the named defendants and others.

21.     TCA had, and continues to have, a legitimate business interest in the enforcement of the Neuberts' promise not to compete.   TCA has an interest in the protection of its goodwill.   This goodwill includes the ongoing and future revenues and referrals from customers developed by the franchisee during the term of the franchise relationship using TCA's Marks and System.   As a matter of the parties' Franchise Agreement and the law in general, it is TCA that has the right to exploit this goodwill (including customer relationships) upon termination of the franchise relationship.   The post-term noncompete also protects TCA's goodwill by avoiding confusion by customers regarding the continued relationship between TCA and the Neuberts.

22. The post-term noncompete further protects TCA's legitimate interest in refranchising the area served by a former franchisee, an interest that is difficult, if not impossible, to protect where a former franchisee or a third party continues to conduct the same business in the same area serving the same customers with the only significant difference being that the competitor is not using the franchisor's Marks. For example, once franchisees like the Neuberts establish a business relationship with a customer using the TCA Marks and System, the customer is likely to continue to patronize the Neuberts (or someone like Vanhook who steps into the shoes of the franchisee) notwithstanding that the competitor is not using the TCA Marks, unless the court enforces the post-term noncompete.

23. The post-term noncompete protects TCA's investment in its franchisees. For example, upon signing the Franchise Agreement and throughout the franchise relationship, TCA provided the Neuberts with training and support to enable them to operate a THE CLEANING AUTHORITY® franchise. The training provided by TCA covered customer service, marketing, purchasing procedures, inventory control, and operational procedures. TCA gave the Neuberts access to confidential and proprietary information included in TCA's Manual Suite, TCA.net, and subsequent informational handouts.

24. The post-term noncompete protects TCA's legitimate interest in the message that breaking a promise not to compete sends to other franchisees. If a franchisee or a third party is allowed to continue in the same business, or assist others in continuing in the same business, with the only difference being that the franchisee or other party does not pay fees to the franchisor, it sends the message to other franchisees "why can't I." If franchisees are thus allowed to break away from the franchise system, it creates the real risk of unraveling the entire franchise system as other franchisees pursue the same course of conduct,

something that harms not only the franchise but also its franchisees whose livelihood is dependent on the continued success of the franchise system.

25.     The post-term noncompete also protects TCA's trade secrets and proprietary information as set forth below.

## The Neuberts' Promise to Protect TCA's Goodwill and Other Interests Through Its General Post-Term Obligations

26.     Pursuant to Sections 11.6 and 18.3 of the Franchise Agreement, the Neuberts had certain obligations upon expiration or termination of the Franchise Agreement, including, (1) immediately paying all fees and charges due and owing to TCA or its affiliates, (2) returning to TCA all copies of the Manual Suite, (3) cancelling all assumed name registrations or other registrations relating to, or incorporating, any TCA Marks, (4) sending to TCA all literature, signs, unused customer contract forms, promotional materials, and other materials, (5) stopping use of the TCA Marks or any colorable imitation of them, (6) complying with the post-term noncompete provision contained in Section 22.2 of the Franchise Agreement, (7) transferring all telephone numbers and directory listings of the cleaning business to TCA, (8) sending to TCA all keys in their possession that relate to a particular customer and providing to TCA requested customer contract information, (9) ceasing to identify themselves or the franchised business as associated in any way with TCA or as formerly associated with TCA, and (10) promptly turning over to TCA "the entire list of customers" and making "no further use of that list for any purpose whatsoever."

## The Neuberts' Promise to Protect TCA's Confidential and Proprietary Information, Including Customer Information

27.     TCA spends substantial time, effort, and money to develop and maintain the confidentiality of its trade secrets.   TCA requires each franchisee to acknowledge in a

franchise agreement the nature of TCA's trade secrets and confidential information and agree not to disclose the information.

28.    TCA additionally password protects TCA.net, allowing TCA to control access to the computer system, monitor who is logged into the computer system, and track changes made to the information contained therein.

29.    Paragraph 11.6 of the Franchise Agreement signed by the Neuberts contained the following confidentiality provision:

> *Trade Secrets and Proprietary Information.* The contents of the Manual Suite and all the operating procedures, standards and rules we prescribe for the Franchised Business are confidential. You will maintain, both during and after the term of this Franchise Agreement, absolute confidentiality of the Manual Suite and all other confidential or proprietary information we disclose to you. You will give this information to your employees only to the extent necessary for the operation of the Franchised Business in accordance with this Franchise Agreement. You will not use this information in any other business or in any way not authorized by us in writing.

30.    The Franchise Agreement specifically stated at paragraph 11.6 that the identity of customers is a trade secret and proprietary information of TCA. According to the Agreement:

> The lists of customers that you service during the term of this Franchise Agreement, is our proprietary information and property. At the expiration or termination of this Franchise Agreement for any reason, you will promptly turn over to us the entire list of customers and you will make no further use of that list for any purpose whatsoever.

31.    By reason of the foregoing, the customers served by the Neuberts during the franchise relationship became at the end of the relationship exclusively TCA customers ("TCA customers").

**The Neuberts' Operation of Their Franchised Business**

32.     The Neuberts operated their franchised business from December 2004 through December 2009, using TCA Marks, System, trade secrets, proprietary information, training, and support to develop goodwill at their franchised location.

33.     By December 2009, the Neuberts had an active base of approximately 370 customers that they had developed using TCA's property.  In fact, had the Neuberts properly managed their franchised business, they could have had far greater than 370 customers by December 2009.  The Neuberts did not, however, properly manage their franchised business. Ultimately, the Neuberts terminated their Franchise Agreement in December 2009, giving rise to the duty on their part to comply with the post-term obligations identified above.

34.     Rather than comply with their obligations under the Franchise Agreement, the Neuberts, individually and in concert with Vanhook, engaged in a course of conduct that was designed to, and did in fact, steal TCA's goodwill, as more fully set forth below.

**Ashley Vanhook**

35.     The Neuberts hired Vanhook on June 10, 2005, as a cleaner of customers' residences.  The Neuberts promoted Vanhook to a trainer on January 9, 2006.  On April 11, 2007, the Neuberts made Vanhook a quality inspector.  On January 14, 2008, they promoted her to the position of manager, a position she held during the remainder of the Neuberts' franchise relationship with TCA.  Over the course of her more than four-year relationship, the Neuberts and Vanhook became close personal friends.  Joanna Neubert in fact described Vanhook as like family — like a daughter.

36.     As manager of the Neuberts' franchised business, Vanhook was responsible for the day-to-day operation of the business.  As such, Vanhook had access to virtually all

information on TCA.net related to the Neuberts' operations. TCA.net is a software system that guides franchisees in essentially all aspects of their franchise operations, including managing initial contracts with potential customers and identifying critical information about customers (name, address, cleaning service dates, rates). For example, Vanhook personally received on behalf of the Neuberts 396 telephone calls from potential customers. She set up and participated in appointments with potential customers, created estimates of the cost of services, entered confidential information about candidates that became customers, and the like. She was also responsible for the hiring, supervision, and firing of employees.

37.    As an employee of the Neuberts, particularly as the manager of the franchised business, Vanhook knew, or certainly should have known, that the Neuberts operated their franchised business pursuant to the terms of a Franchise Agreement with TCA and knew that TCA had its principal place of business in Maryland. She knew that TCA owned and ultimately controlled TCA.net and that the thousands of data entries she made were downloaded into a database located in Maryland. TCA believes that Vanhook knew of, or certainly should have known of, the contractual obligations of the Neuberts described above. Further, Vanhook had to know that the conduct described herein would injure TCA in Maryland.

**The Neuberts' Precipitous Termination of the Franchise Agreement**

38.    The term of the Franchise Agreement was, according to paragraph 2.2, ten years beginning on December 16, 2004, and ending on December 15, 2014. The Agreement was not terminable except for cause during its ten-year term. The Neuberts were therefore duty bound to operate the franchise for at least ten years and had various renewal rights at the

end of the ten-year period, unless they terminated the Agreement in accordance with paragraph 18.1.

39.     The Neuberts did have a right under paragraph 18.1 to terminate the Franchise Agreement prior to December 15, 2014, but only if TCA was in material breach of the Agreement and failed to cure the breach within thirty days after written notice by the Neuberts of the breach.

40.     The Neuberts did not give TCA written notice of any supposed material breach of the Franchise Agreement, let alone the thirty-day opportunity within which to cure any supposed breach.   Instead, they abandoned their franchise and thereby terminated the Franchise Agreement after giving TCA less than three hours' prior notice that they were walking away from the business.  Specifically, in an email dated December 18, 2009, sent to TCA at 2:32 p.m., the Neuberts advised TCA that they had "decided to close this business effective 5PM today, December 18, 2009."   A copy of the December 18, 2009, email is attached as Exhibit C.

**The Neuberts' and Vanhook's Conspiracy to Convert TCA's Goodwill**

41.     Notwithstanding the contractual obligations set forth above, the Neuberts, in conjunction with Vanhook, engaged in a course of conduct that was designed to steal, and did in fact steal, TCA's customers and therefore its goodwill.  Rather than comply with their contractual obligations to cooperate with TCA in protecting TCA's trade secrets and TCA's goodwill associated with the Neuberts' use of the TCA Marks and System, the Neuberts directly and indirectly advised and assisted Vanhook in establishing and continuing to operate the identical cleaning business at the same location as the Neuberts conducted their franchise

business, the retention of the Neuberts' employees, the identification of confidential customer information (names, addresses, cleaning schedule, billing information), and the like.

**The Friday, December 18, 2009, Telephone Conversation**

42.     The defendants, as a part of this course of conduct, concealed from TCA their efforts to convert TCA goodwill and misrepresented the true facts to TCA.  For example, on Friday, December 18, 2009, upon receipt of the Neuberts' email informing TCA of the closure of the franchise in less than three hours, TCA (Allen Thrift and Rob Weddle) contacted the Neuberts (Frederick Neubert) by telephone.  TCA contacted the Neuberts in an effort to secure their compliance with their obligations under the Franchise Agreement.  One obligation, set forth in paragraph 18.3(h), was for the Neuberts to send customers' keys to TCA upon request.  It is common for TCA customers to provide keys to franchisees for access to their homes without the presence of the customer.  One purpose of requiring that the Neuberts send customer keys to TCA was that it gives TCA the opportunity to continue to provide services to THE CLEANING AUTHORITY® customers independent of the Neuberts upon termination of the franchise relationship.  The Neuberts informed TCA during the December 18 conversation that they had destroyed customer keys.  The Neuberts also represented that they had contacted customers and told them that they had destroyed their keys.  Not only was this a breach of the Franchise Agreement, it was also a false statement. In fact, the Neuberts has delivered control of customer keys to Vanhook.

43.     TCA also wanted the Neuberts to comply with their promise under paragraph 18 of the Franchise Agreement to provide customer information requested by TCA.  TCA explained to the Neuberts in the December 18 telephone conversation that agreements with customers are the property of TCA that the franchisee must turn over to TCA upon

termination of the relationship.  TCA demanded that the Neuberts turn over all customer contracts to TCA.  The Neuberts claimed that rather than incur the expense of boxing agreements and sending them to TCA, they had destroyed customer contracts.  In fact, the Neuberts had not destroyed customer information and had not protected TCA's right to possession of customer lists, but had in fact allowed Vanhook uncontrolled access to customer lists and assisted defendant Vanhook in continuing to service customers following the Neuberts' termination of the franchise relationship.

44.    The Neuberts also admitted to TCA during the December 18 telephone conversation that they had not decided for the first time on December 18 (when they first notified TCA) to terminate the franchise relationship.  In fact, TCA learned on the afternoon of December 18 that the Neuberts had sent a letter to TCA customers dated December 7, 2009, advising them that "we have decided to close the business" and "that our last day will be December 18, 2009."  A copy of the letter is attached as Exhibit D.  TCA also learned that enclosed with the letter to customers was Vanhook's business card, as discussed below. During the December 18 conversation, the Neuberts told TCA that their employees did not know that the Neuberts were closing the business that day and that the Neuberts planned to inform them for the first time on Monday, December 21, 2009, when the employees showed up for work, so as to avoid a mass exodus of employees on December 18.  The Neuberts claimed that they did not believe that their former employees would continue to provide cleaning services to TCA customers once informed of the closing of the business and denied that they were involved in any organized effort to provide continued services to TCA's customers.  In truth, the Neuberts knew full well on December 18 that as of December 21, 2009, their former employees would become the employees of Vanhook and that the former

16

employees would continue to service TCA customers as Vanhook employees the same as they had as Neubert employees. Contrary to their representations to TCA, the Neuberts and Vanhook were in fact involved in an organized effort to deprive TCA of its goodwill by converting TCA customers to Vanhook. Contrary to their representation that they planned to tell employees on December 21, 2009, of the closing of their business, Neuberts did not even show up at 120 Halton Road on December 21.

45.     Notwithstanding their claim that they had decided as of at least December 7, 2009, to close down their business, the Neuberts in fact continued to establish new customer relationships after December 7, 2009. The Neuberts continued to interview new customers, sign up new customers, and perform cleaning services for new customers for the first time after December 7, 2009. For example, the Neuberts entered five new customer agreements into the TCA computer system subsequent to December 7 and prior to December 18, 2009, during a period it claims that it had decided to provide no further services to any customers as of December 18. The obvious purpose of doing so was so that Vanhook had the benefit of the additional customers as she took over the operation of the business as of December 21, 2009. Four of these entries were made by Joanna Neubert and one by Vanhook.

46.     Contrary to their obligations to TCA and contrary to their representations to TCA, the Neuberts encouraged Vanhook to continue to service TCA customers after December 18, 2009. As of December 7, 2009, Vanhook had already prepared business cards for a company she called "Premiere Cleaning Services." A copy of the card is attached as Exhibit E. Vanhook identified her place of business on her business card as 120 Halton Road, Suite 9, Greenville, South Carolina — the very same address of the Neuberts' THE CLEANING AUTHORITY® franchise. TCA believes that the Neuberts caused one of

Vanhook's business cards to be placed in each of the December 7 letters it sent to customers. Moreover, by November 9, 2009, nearly one month before the Neuberts sent the December 7 letter to customers, Ms. Vanhook had already formed a South Carolina corporation called Premiere Cleaning Services, Inc., as reflected in attached Exhibit F. All of this, and more, was known to the Neuberts and deliberately hidden from TCA.

47.     The Neuberts also forwarded the telephone numbers assigned to their franchised business to their personal cellular telephone numbers rather than transferring them to TCA.

48.     The Neuberts claim that they have no continuing interest in Vanhook's business, but TCA believes discovery in this matter may well prove otherwise.

**Surveillance by Private Investigator**

49.     Upon learning of the Neuberts' plan to walk away from their franchised business, TCA hired a private investigator to conduct surveillance at 120 Halton Road. The investigator observed on Sunday, December 20, 2009, vehicles owned by the Neuberts and a vehicle that TCA believes was operated by Vanhook at 120 Halton Road. TCA believes that the Neuberts and Vanhook were finalizing at that time a transfer to Vanhook of the TCA customers, account information, occupation of the premises, equipment, and employee records.

50.     The investigator also conducted surveillance at 120 Halton Road on December 21, 2009, the day upon which the Neuberts represented to TCA that they planned to inform employees of the closing of their business. Based on the investigator's surveillance, TCA believes that neither of the Neuberts was at 120 Halton Road on December 21. TCA believes that the only manager that arrived at 120 Halton Road was Vanhook, who then

declared herself the owner through Premiere Cleaning Services of the former franchised business.  Also arriving at 120 Halton Road were former employees of the Neuberts who had now become employees of Vanhook and her company and who continued to clean residences of TCA customers as if nothing had changed.

## TCA's Efforts to Refranchise the Territory

51.    Upon discovering the Neuberts' wrongful termination of the Franchise Agreement, TCA searched for a new franchisee to replace the Neuberts and operate a THE CLEANING AUTHORITY® franchised business in the Neuberts' former territory.  TCA identified a candidate.  Unfortunately, it is virtually impossible to refranchise an area where, as with the Greenville territory, the former franchisee or other third party is conducting the same business, out of the same location, using the same employers, and serving the same customers on the same terms as when the franchisee operated the business.  In addition, TCA was prepared to operate a THE CLEANING AUTHORITY® business in the Neuberts' former territory until replaced by a new franchisee.

52.    TCA did in fact identify a franchisee candidate to continue servicing TCA cleaning customers in the Neuberts' former territory.  Because of the impossibility of refranchising the territory while the Neuberts or Vanhook, or both, continued to service TCA customers in the territory, TCA asked the Neuberts and Vanhook to cooperate with TCA in transitioning customer relationships to the new franchisee, as they were obliged to do as a result of their previous conduct.  The request was set forth in a letter dated January 26, 2010, from TCA's attorney to the Neuberts' attorney and to Vanhook, a copy of which is attached as Exhibit G.  The defendants refused to cooperate and instead continued then and continue still today to deprive TCA of its right to its goodwill as detailed above.  As a result, TCA lost the

opportunity to refranchise the territory, as more fully explained in a letter dated February 8, 2010, from TCA's attorney to the Neuberts' attorney, a copy of which is attached as Exhibit H.

## COUNT I — BREACH OF CONTRACT

### (The Neuberts)

53.   TCA realleges all previous paragraphs of the Verified Amended Complaint.

54.   The Franchise Agreement was a valid contract supported by good and valuable consideration and fully enforceable between the parties.

55.   TCA has fully complied with all conditions under the Franchise Agreement.

56.   By the acts and omissions set forth above (including specifically their failure to comply with the in-term noncompete, the post-term obligations, and the confidentiality provisions in the Franchise Agreement), the Neuberts have breached their contract with TCA.

57.   As a direct and proximate result of the Neuberts' breaches of contract, TCA has suffered and will continue to suffer damages, some, but not all, of which may be quantified.   The damages are quantifiable to the extent TCA has likely lost its ability to refranchise the Neuberts' former Territory and will sustain ongoing damages beyond the term of the Franchise Agreement.   TCA will prove up these damages at trial.

58.   As a direct and proximate result of the Neuberts' breaches of contract, and absent injunctive relief, TCA will continue to suffer irreparable harm, for which there is no adequate remedy at law.

## COUNT II — BREACH OF CONTRACT/WRONGFUL TERMINATION

### (The Neuberts)

59.   TCA realleges all previous paragraphs of its Verified Amended Complaint.

60.     The Franchise Agreement entered into by the Neuberts with TCA is a valid contract supported by good and valuable consideration and fully enforceable between the parties.

61.     TCA has fully complied with all conditions under the Franchise Agreement.

62.     Under the Franchise Agreement, the Neuberts agreed to pay to TCA, and TCA expected to receive, as royalties a percentage of the gross revenues they generated as TCA franchisees for the initial term of the Agreement.  The Neuberts also agreed to pay to TCA, and TCA expected to receive, as a national advertising fee a percentage of the gross revenues they generated as TCA franchisees for the initial term of the Agreement.

63.     The initial term of the Franchise Agreement was to expire according to its terms on December 15, 2014.

64.     With approximately five years remaining on the term of the Franchise Agreement, the Neuberts wrongfully terminated the Agreement.

65.     On average, the Neuberts have paid to TCA approximately $1,000 per week in royalty fees and national advertising fees.

66.     By the acts and omissions set forth above, including specifically their wrongful termination of the Franchise Agreement, the Neuberts have breached their contract with TCA.

67.     As a direct and proximate result of the Neuberts' breach of contract, TCA has suffered damages, including loss of royalty and national advertising fees owed for the remainder of the Franchise Agreement term, in the amount of at least $260,000.

68.     When the Franchise Agreement was executed, the Neuberts could have reasonably foreseen that such damages, including a loss of future profits to TCA, would be a probable result of their breach.

69.     As stated above, because of the failure of the Neuberts to comply with their in-term and post-term obligations TCA will not likely be able to refranchise the Territory before or after December 15, 2014, meaning that its lost future royalties and advertising fees will extend beyond December 15, 2014.   Further, had the Neuberts cooperated with TCA in establishing a new franchisee in the Greenville territory, the new franchise would likely have been better operated and produced more royalties and advertising fees for TCA, and therefore, TCA's future damages are greater than the loss of fees that the Neuberts would have paid had they operated the Franchise Agreement through December 15, 2014.

## COUNT III — CONVERSION OF TCA GOODWILL

### (All Defendants)

70.     TCA realleges all previous paragraphs of its Verified Amended Complaint.

71.     As a franchisor, TCA owns the goodwill attendant to its franchisees' use of its Marks and System.   Goodwill includes, among other things, the ongoing relationship with the end-user of services provided by TCA franchisees — the customer.   As a franchisor, TCA had the right to possess the goodwill during the existence of the franchise relationship, a right which it shared with its franchisees, the Neuberts.   During the term of the franchise relationship, TCA metaphysically transferred to the Neuberts the right to use and develop goodwill for the term of the franchise relationship, but at the end of the relationship, all goodwill flowed back to TCA and TCA alone has the exclusive right to the goodwill.

72.     Defendants, by their actions, both before and after the termination of the Franchise Agreement, deprived TCA, and even today continue to deprive TCA, of its right to possess its goodwill and its exclusive right to customer information, as well as converted them to their own use.

73.     As a direct result of defendants' improper conduct, TCA has suffered and will continue to suffer damages.

74.     As a direct result of defendants' improper conduct, and absent injunctive relief, TCA will continue to suffer irreparable harm, for which there is no adequate remedy at law.

### COUNT IV — TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS

**(All Defendants)**

75.     TCA realleges all previous paragraphs of its Verified Amended Complaint.

76.     Defendants were at all times aware of the relationships that existed between TCA and customers developed by the Neuberts using the TCA Marks and System and knew that such relationships were ongoing, carrying with them the prospect of future income and referrals for TCA.

77.     Defendants intended to and have in fact harmed and continue to harm such relationships by conspiring to compete and in fact competing with TCA to provide residential home cleaning services and by using TCA's confidential customer and other proprietary information to harm TCA's relationships with actual and prospective customers.

78.     Defendants' conduct has been calculated to cause damage to TCA or to benefit the defendants at the expense of TCA and is being done with the unlawful purpose to cause such damage, without right or justifiable cause on the part of defendants.

79.     Defendants' conduct has constituted improper methods.

80.     As a direct result of defendants' improper conduct, TCA has suffered and will continue to suffer damages.

## COUNT V — TORTIOUS INTERFERENCE WITH CONTRACT

### (Vanhook)

81.     TCA realleges all previous paragraphs of its Verified Amended Complaint.

82.     The Franchise Agreement entered into by the Neuberts with TCA is a valid contract supported by good and valuable consideration and fully enforceable between the parties.

83.     TCA has fully complied with conditions under the Franchise Agreement.

84.     Vanhook knew of the Franchise Agreement between the Neuberts and TCA.

85.     The Neuberts, by their conduct, breached the Franchise Agreement.

86.     By reason of her conduct, Vanhook intentionally induced the Neuberts to breach their in-term and post-term obligations, as well as their obligations to maintain the confidentiality of customer information.

87.     Vanhook's conduct was wrongful and without justification.

88.     As a direct result of the Vanhook's improper conduct, TCA has suffered and will continue to suffer damages.

89.     As a direct result of Vanhook's improper conduct, and absent injunctive relief, TCA will continue to suffer irreparable harm, for which there is no adequate remedy at law.

## COUNT VI — VIOLATION OF
## MARYLAND UNIFORM TRADE SECRETS ACT

### (All Defendants)

90.   TCA realleges all previous paragraphs of its Verified Amended Complaint.

91.   The conduct of defendants set forth above in using TCA's trade secrets, including, without limitation, TCA's customer and other proprietary information, violates the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code. Ann. Com. Law § 11-201 et seq. (2006), and constitutes an intentional tort under Maryland law.

92.   The above-described trade secrets (1) derive independent economic value to TCA, actual or potential, from not being generally known by, and not being readily ascertainable by, other persons who can obtain economic value from their disclosure or use, and (2) are the subject of efforts by TCA that are reasonable under the circumstances to maintain their secrecy.

93.   Upon information and belief, defendants have in the past misappropriated, and are continuing to misappropriate, TCA's trade secrets by disclosing and/or using such trade secrets without TCA's express or implied consent knowing that the trade secrets were acquired by improper means; knowing or having reason to know that knowledge of the trade secrets was derived from or through the Neuberts who had utilized improper means to acquire it; acquired under circumstances giving rise to a duty on the part of the Neuberts to maintain their secrecy or limit their use; and/or derived from or through the Neuberts who owed a duty to TCA to maintain their secrecy or limit their use.

94.   As a direct and proximate result of the defendants' violation of the MUTSA and otherwise tortious conduct, TCA has suffered and will continue to suffer damages.

95.    As a direct and proximate result of the defendants' continuing disclosure and/or use of TCA's trade secrets in violation of the MUTSA, and absent injunctive relief, TCA will continue to suffer irreparable harm, for which there is no adequate remedy at law.

## COUNT VII — CIVIL CONSPIRACY

### (All Defendants)

96.    TCA realleges all previous paragraphs of its Verified Amended Complaint.

97.    Defendants entered into an unlawful conspiracy to convert TCA's goodwill, deprive TCA of its rights under the Franchise Agreement, and to otherwise harm TCA. This conspiracy included, without limitation, the acts described above, acts which include tortious conduct by the Neuberts.

98.    Defendants intended to injure TCA by conspiring to engage in these wrongful acts.

99.    All of defendants' actions have been taken in furtherance of defendants' conspiratorial agreement.

100.    In the course of their conspiracy, defendants have acted willfully and maliciously to injure TCA and to obtain and misuse its confidential and proprietary business information, including, without limitations, customer information.

101.    TCA has suffered, and will continue to suffer, harm in the absence of injunctive relief, substantial and irreparable damage as a result of defendants' tortious conduct.

102.    Defendants' actions are a direct and proximate cause of TCA's damages.

## COUNT VIII — UNJUST ENRICHMENT

### (All Defendants)

103.   TCA realleges all previous paragraphs of its Verified Amended Complaint.

104.   TCA conferred a benefit upon defendants as a result of defendants' wrongful acquisition of the goodwill and trade secrets and proprietary information of TCA.

105.   Defendants knew of and appreciated the benefit conferred by TCA.

106.   Defendants accepted and retained the benefit under circumstances that make it inequitable for defendants to retain the benefit without paying for it.

## COUNT IX — AIDING AND ABETTING

### (Vanhook)

107.   TCA realleges all previous paragraphs of its Verified Amended Complaint.

108.   The conduct of the Neuberts identified above constituted the performance of unlawful acts that caused injury to TCA.

109.   Vanhook substantially assisted the Neuberts in committing the unlawful acts.

110.   Vanhook was generally aware of her role as a part of the overall wrongful conduct described above at the time she provided assistance to the Neuberts in committing the unlawful acts.

111.   Vanhook is liable to TCA for damages attributed to her aiding and abetting the Neuberts in the performance of the unlawful acts.

## COUNT X — DAMAGES

### (All Defendants)

112.   TCA realleges all previous paragraphs of its Verified Amended Complaint.

113.    By reasons of the foregoing conduct, all defendants are joint and severally liable for all of the damages identified in the preceding paragraphs.

114.    In addition, TCA is entitled to damages in the form of income derived by defendants from the operation of any business in violation of TCA's rights.

## COUNT XI — ACCOUNTING

### (All Defendants)

115.    TCA is entitled to an accounting by defendants of the gross profits derived by defendants as a result of their wrongful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, TCA prays this Court for:

1.    Judgment to be entered in its favor and against defendants;

2.    Entry of a preliminary and permanent injunction as follows:

    a.    Requiring defendants, and all persons acting in active concert or participation with them, to comply immediately with all of the *"Obligations after Termination or Expiration"* set forth in Section 18.3 of the Franchise Agreement for which they are not already in compliance, including, but not necessarily limited to:

        i.    Complying with the post-term noncompete as stated in Section 18.3(f) of the Franchise Agreement;

        ii.    Transferring to TCA all telephone numbers and directory listings of any cleaning business operated in any way by any of the defendants;

      iii.     Sending to TCA all keys that relate to a particular customer in accordance with Section 18.3(h) of the Franchise Agreement;

b.     Restraining defendants' from converting TCA's goodwill to their own use;

c.     Restraining defendants from using TCA's trade secrets in violation of the Maryland Uniform Trade Secrets Act;

d.     Restraining defendants from further tortiously interfering with TCA's prospective business relations;

e.     Restraining defendants from competing against TCA, using TCA's confidential information and trade secrets, and advertising or otherwise using TCA's trade name in violation of, among other things, the Franchise Agreement;

f.     Restraining defendants and all those in active concert or participation with them from destroying, moving, or altering any of their business records, including all documents in their possession, custody, or control that evidence, concern, refer, or relate to any TCA services provided to customers of the former franchised business or the competing residential home cleaning business;

g.     Restraining defendants from leasing, selling, or transferring the assets of the former franchised business;

h.     Requiring defendants and all those in active concert or participation with them to return immediately to TCA any and all TCA documents as well as documents generated using TCA information that are currently

in their possession or reasonably accessible to them, regardless of the form of such documents, and including but not limited to documents and files stored electronically;

    i.    Requiring defendants to provide TCA with a full accounting of the revenues and expenses of the business;

    j.    Requiring defendants to provide a full accounting of their sales and revenues realized from sale services diverted from TCA;

3.    An award of TCA's actual attorneys' fees incurred, together with court costs and expenses of suit, in accordance with Section 23.4 of the Franchise Agreement and any applicable laws;

4.    Judgment in the amount of past and future damages plus interest; and

5.    Such further relief as the Court deems just and proper.

Dated:  March 16, 2010

HOGAN & HARTSON

s/Gil A. Abramson
Gil A. Abramson
100 International Drive, Suite 2000
Baltimore, MD 21202
Phone: 410-659-2700
Fax:  410-659-2701

and

FAEGRE & BENSON LLP
William L. Killion, MN Atty. #55700
(admitted *pro hac vice*)
Myriam Pierre Warren, MN Atty. #389804
(admitted *pro hac vice*)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Phone: 612-766-7000
Fax: 612-766-1600

Attorneys for Plaintiff
The Cleaning Authority, Inc.

fb.us.4968935.03

**VERIFICATION OF AMENDED COMPLAINT**

State of Maryland

County of Howard

Allen Thrift, being duly sworn, states as follows:  I am the Senior Vice President of

The Cleaning Authority (TCA), the Plaintiff in this matter.  I attest that the facts and

allegations contained in the Verified Amended Complaint to which this Verification is

attached are true, except so far as they are therein stated to be on information or belief, and

that, so far as they are therein stated to be on information and belief, I and therefore TCA

believe them to be true.


s/Allen Thrift *
Allen Thrift


Taken, sworn to and subscribed before me this __16th__ day of ___March___, 2010.


s/Amy McColley *
Notary Public


* A copy of the signature page bearing original signatures is attached hereto.