**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE CLEANING AUTHORITY, INC. | * | |
| | * | |
| v. | * | Civil No. JFM 10-CV-00203 |
| | * | |
| JOANNA NEUBERT, *et al.* | * | |
| | * | |
| | * | |
| THE CLEANING AUTHORITY, INC. | * | |
| | * | |
| v. | * | Civil No. JFM 09-CV-03447 |
| | * | |
| M. SCOTT ALDRICH, DENISE ALDRICH, | * | |
| and JANE DOES | * | |
| | * | |
| | * | |

\*\*\*\*\*\*

## MEMORANDUM

These actions arise from disputes surrounding franchise agreements. In the first action,

Plaintiff The Cleaning Authority ("TCA") brings several claims against Defendants Joanna

Neubert and Frederick Neubert (collectively the "Neuberts") and/or Defendant Ashley N.

Vanhook ("Vanhook").[1] In the second action, TCA brings many of the same claims against

Defendants M. Scott Aldrich and Denise Aldrich (collectively the "Aldriches") and/or Jane

Does.[2] The second action was transferred to me for consolidation on May 20, 2010. Several

motions are now pending. The Neuberts filed a motion to dismiss portions of Counts I and III

---

[1] The counts are: (1) two breach of contract claims against the Neuberts; (2) claims for conversion of goodwill, tortious interference, violation of Maryland Uniform Trade Secrets Act ("MUTSA"), civil conspiracy, unjust enrichment, damages, and accounting against the Neuberts and Vanhook; and (3) a claim for aiding and abetting against Vanhook.
[2] The counts are (1) two claims for breach of contract against the Aldriches; (2) claims for conversion of goodwill, tortious interference, violation of MUTSA, civil conspiracy, unjust enrichment, damages, and accounting against the Aldriches and Jane Does; and (3) claims for tortious interference and aiding and abetting against the Jane Does.

(breach of contract and conversion of TCA goodwill).[3]  They have also filed counterclaims.  The Aldriches moved to dismiss portions of Counts I and III (breach of contract and conversion of TCA goodwill).[4]  Vanhook filed a motion to dismiss for lack of personal jurisdiction.[5]  TCA challenged Vanhook's motion to dismiss and also filed a motion for leave to conduct jurisdictional discovery.  For the following reasons, Vanhook's motion to dismiss will be granted, and the Aldriches' and Neuberts' motions to dismiss will be denied.[6]

## I. FACTS

TCA is a Maryland corporation with its principal place of business in Columbia, Maryland.  (Amended Complaint at ¶ 1.)  For more than ten years, TCA has franchised THE CLEANING AUTHORITY® residential home cleaning business throughout the United States.  TCA offers a "business format franchise," meaning it offers an entire method of doing business, including methods, standards, and specifications that constitute THE CLEANING AUTHORITY® system of doing business (the "System").  (*Id.* at ¶ 9.)  TCA also licenses franchisees to use its registered trade name, trade dress, and service marks, as well as certain other designs, phrases, logos, etc.  (*Id.* at ¶10.)  As of December 2009, there were 180 domestically franchised THE CLEANING AUTHORITY® businesses in the United States.  (*Id.* at ¶ 12.)  The franchisees offer residential home cleaning services, using TCA's exclusive "Detail-Clean Rotation System."  (*Id.* at ¶ 13.)  The franchisees also use special training materials, sales techniques, and personnel management and management control systems,

---

[3] The parties stipulated that the Neuberts' motion to dismiss, although filed in response to the initial Complaint, is valid as to the Amended Complaint. (Docket No. 25.)

[4] The parties stipulated that the Aldriches' motion to dismiss, although filed in response to the initial Complaint, is valid as to the Amended Complaint. (Docket No. 28.)

[5] Vanhook's initial motion to dismiss (Docket No. 4) was mooted when TCA filed its Amended Complaint (Docket No. 17).  Consequently, only the motion to dismiss the Amended Complaint is before the Court. (Docket No. 29.)

[6] The Aldriches also raise the issue of whether Count II of the Amended Verified Complaint should be dismissed or stayed on the basis that it is subject to arbitration under the Franchise Agreement.  This argument was only discussed briefly in a footnote to Plaintiff's Reply brief and has not been sufficiently addressed by the parties.

including TCA's customized, proprietary business management software called "TCA.net." (*Id.* at ¶ 14.) TCA.net "is a software system that guides franchisees in essentially all aspects of their franchise operations, including managing initial contracts with potential customers and identifying critical information about customers (name, address, cleaning service dates, rates)." (*Id.* at ¶ 36.)

On December 16, 2004, TCA entered a written franchise agreement with the Neuberts ("Neubert Franchise Agreement"), granting them the right to open and operate a TCA cleaning business within a specified territory consisting of certain Zip Codes in South Carolina. (Amended Complaint at ¶ 15.)  Contemporaneously with their execution of the Neubert Franchise Agreement, the Neuberts also executed a Mailer Services Agreement ("MSA") with TCA's affiliate, S&T Management, Inc. d/b/a TCA Advertising or TCA Supplies ("S&T"), to mail customers advertisements for the franchised business.  The term of the MSA was co-terminous with the term of the Neubert Franchise Agreement. (*Id.* at ¶ 16.)  As part of the consideration for receiving the franchise opportunity from TCA, the Neuberts agreed to pay TCA a percentage of the gross revenue they generated as franchisees, as well as a national advertising fee.  They also promised to comply with certain terms and conditions.  (*Id.* at ¶ 17.)  These terms included a noncompete clause, steps to protect the goodwill and other interests of TCA, and a promise to protect TCA's confidential and proprietary information including customer information.  (*Id.* at ¶¶ 18-31.)

The Neuberts operated their franchised business from December 2004 through December 2009, using TCA Marks, System, trade secrets, propriety information, training, and support. (Amended Complaint at ¶ 32.)   During this time, on June 10, 2005, the Neuberts hired Vanhook as a cleaner of customers' residences.  She was promoted several times, to a trainer, then a

quality inspector, and finally as the office manager.  (*Id.* at ¶¶ 34-35.)  As manager of the

Neubert's franchised business, Vanhook was responsible for the daily operations of the franchise

and had access to virtually all information on TCA.net.  She was also responsible for the hiring,

supervision, and firing of employees.  (*Id.* at ¶ 36.)  TCA alleges that Vanhook knew or should

have known that the Neuberts were subject to the Neubert Franchise Agreement.

In December 2009, when the Neuberts had an active base of approximately 370

customers, they terminated the Neubert Franchise Agreement.  (*Id.* at ¶ 33.)   Under the terms of

the Neubert Franchise Agreement, however, the term was for ten years and they could only

terminate early if TCA was in material breach of the Agreement and failed to cure the breach

within thirty days after written notice by the Neuberts.  (*Id.* at ¶ 38.)  The Neuberts provided less

than three hours' prior notice that they were terminating the franchise, in an email sent December

18, 2009.  (*Id.* at ¶ 40.)  TCA further alleges that after this early termination, the Neuberts helped

Vanhook continue to operate an identical cleaning business at the same location as the franchise,

retaining the same employees, and using the same confidential customer information.  (*Id.* at ¶

41.)  The Neuberts and Vanhook refused to return customer keys or provide TCA with customer

information and intentionally concealed their course of conduct. (*Id.* at ¶¶ 42-44.)  They also

allegedly conducted other similar and related conduct in violation of the Neubert Franchise

Agreement.  (*Id.* at ¶¶ 45-48.)  TCA attempted to refranchise the area but found doing so difficult

because Vanhook was conducting virtually the same business and refused to cooperate with

transitioning TCA customers to a new franchisee. (*Id.* at ¶¶ 51-52.)

In the second suit, TCA alleges similar circumstances with regards to the Aldriches and

Jane Does.  On December 9, 2003, TCA and the Aldriches entered into a written franchise

agreement ("Aldrich Franchise Agreement") similar to the Neubert Franchise Agreement but

covering a different area in South Carolina. They also executed the MSA agreement with S&T. (Second Amended Complaint at ¶¶ 15-31.) The Aldrich Franchise Agreement was also for a ten year term, so the Aldriches could only terminate it prior to December 8, 2013 if TCA committed a material breach of the Agreement and failed to cure it within thirty days of receiving written notice of the breach. (*Id.* at ¶¶ 36-37.)

On October 7, 2009, the Aldriches sent an email to TCA, requesting verification of all brochure mailings for their franchise for the weeks ending August 8, 2009, August 15, 2009, and August 29, 2009. Although S&T and TCA were not obligated to provide this information, they sent the Aldriches an email verification of the mailers (by total pallet weight) based on the United States Postal Service Plan-Verified Drop Shipment Verification and Clearance Form 8125. (*Id.* at ¶ 40.) The Aldriches found this information insufficient and provided TCA with a purported Notice of Breach, asserting that TCA failed to provide "proof of mailing" and failed to disclose in a Uniform Offering Circular that TCA has supposedly received "vendor rebates" from S&T. (*Id.* at ¶ 41.) On November 21, 2009, the Aldriches sent an email to TCA threatening to stop paying for mailings as of November 28, 2009. (*Id.* ¶ at 42.) TCA's counsel responded by denying the supposed breaches, attempting to address the Aldriches' concerns, and advising them to seek legal counsel. (*Id.* at ¶ 43.) The Aldriches served TCA with a purported Notice of Termination on December 2, 2009, stating that the Aldriches were giving TCA ten days notice of termination. (*Id.* at ¶ 44.) After some additional correspondence, TCA's counsel advised the Aldriches that TCA would discontinue services as of December 13, 2009 and would seek to enforce TCA's legal rights. (*Id.* at ¶¶ 45-48.)

TCA alleges that after termination, the Aldriches advised and assisted Jane Does in continuing to operate an identical cleaning business, at the same location, with the same

employees, and serving the same customers.  (*Id.* at ¶ 49.)  It is further alleged that the Aldriches

and Jane Does intentionally concealed this conduct from TCA and refused to cooperate, much

like the Neuberts and Vanhook. (*Id.* at ¶ 50-51.)  They also electronically terminated over 300

TCA customers from TCA.net and continued to provide services to those customers.  (*Id.* at ¶¶

52-57.)  TCA further alleges that the Aldriches have failed to pay $4,561.08 in outstanding fees

and costs.  (*Id.* at ¶ 59.)  TCA claims it is the process of locating a new franchisee for the

territory but that it will be difficult to do so while the Jane Does continue to compete for the

business.  The Aldriches have refused to identify the Jane Does. (*Id.* at ¶¶ 62-63.)

## II. VANHOOK'S MOTION TO DISMISS UNDER Fᴇᴅ. R. Cɪᴠ. P. 12(b)(2)

### A.  Standard of Review

The plaintiff bears the burden of showing that the court has personal jurisdiction over

each defendant.  *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  At the motion to dismiss

stage, the plaintiff need only make a *prima facie* showing of personal jurisdiction.  *Id.*; *Carefirst*

*of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  In

determining whether a plaintiff has met this burden, "the court must construe all relevant

pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the

most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676.

Two conditions must be met for a district court to assert personal jurisdiction over a

nonresident defendant: "(1) the exercise of jurisdiction must be authorized under the state's long-

arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements

of the Fourteenth Amendment." *Carefirst*, 334 F.3d at 396 (citation omitted).  "With regard to

the first requirement, [the district court] must accept as binding the interpretation of Maryland's

long-arm statute rendered by the Maryland Court of Appeals." *Id.* (citing *Mylan Labs., Inc. v.*

*Akzo, N.V.*, 2 F.3d 56, 61 (4th Cir. 1993). Because Maryland courts have long held that the

Maryland long-arm statute and the due process clause are coextensive, many federal courts have

described the statutory inquiry as "merging" with the constitutional inquiry. *Dring v. Sullivan*,

423 F. Supp. 2d 540, 544-45 (D. Md. 2006) (citations omitted). The Maryland Court of Appeals

has clarified, however, that it is still necessary to address the long-arm statute when analyzing

personal jurisdiction. *Id.* at 545 (citing *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 493 n.6

(Md. 2006)). In some instances, constitutional due process may be satisfied even though the

long-arm statute is not. *Id.* (citing *Joseph M. Coleman & Assocs., Ltd. v. Colonial Metals*, 887 F.

Supp. 116, 119 (D. Md. 1995)).

Depending upon the relationship between the defendant and the forum state, a court may

have either general or specific jurisdiction. General jurisdiction "arises where the defendant's

contacts with the forum are continuous, systematic, and fairly extensive." *Cole-Tuve, Inc. v. Am.

Mach. Tools Corp.*, 342 F. Supp. 2d 362, 366 (D. Md. 2004) (citation omitted). In the absence of

contacts sufficient for general jurisdiction, a court may exercise specific jurisdiction if:

> (1) the defendant purposely directed its activities toward residents of Maryland or
> purposely availed itself of the privilege of conducting activities in the state; (2)
> the plaintiff's cause of action arises out of or results from the defendant's forum-
> related contacts; and (3) the forum's exercise of personal jurisdiction in the case is
> reasonable, that is, consistent with "traditional notions of fair play and substantial
> justice."

*Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477-78 (1985). Here, TCA does not

contend that Vanhook's activities are sufficiently extensive for general jurisdiction, so only

specific jurisdiction is at issue.

## B. Application

Vanhook's connections to Maryland are extremely limited. It is uncontested that

Vanhook has never visited Maryland, owned property in Maryland, entered into a contract in

Maryland, or solicited business in Maryland. TCA's allegations in support of finding jurisdiction are essentially that Vanhook knew that the Neuberts had a contract with TCA, was aware that TCA is a Maryland corporation, accessed TCA.net, and corresponded with TCA via phone and email prior to termination of the Neubert Franchise Agreement. Even if these observations are accurate, which is contested in part, these circumstances are insufficient to establish jurisdiction under any of the rationales provided by TCA. Put plainly, these facts do not show purposeful availment of Maryland law, and finding personal jurisdiction here would violate traditional notions of fair play and justice. TCA's specific arguments are addressed more fully below.[7]

## 1. **Long Arm Statute**

Given the Court of Appeals' recent clarification that the long-arm statute remains a separate component of the analysis, it is appropriate to begin with the statute. *Dring*, 423 F. Supp. 2d at 545. Maryland's statute provides in relevant part,

> (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:
> (1) Transacts any business or performs any character of work or service in the State; . . .
> (3) Causes tortious injury in the State by an act or omission in the State;
> (4) Causes tortious injury in the State . . . by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State . . . .

MD. CODE. ANN., CTS. & JUD. PROC., §6-103. The long-arm statute applies "to computer information and computer programs in the same manner as they apply to goods and services." MD. CODE. ANN., CTS. & JUD. PROC., §6-103(c)(2).

---

[7] TCA provides a somewhat confusing list of overlapping arguments regarding personal jurisdiction: (1) special jurisdiction based on the "effects test"; (2) special jurisdiction based on the conspiracy theory of personal jurisdiction; (3) special jurisdiction based on the *Burger King* minimum contacts test; and (4) jurisdiction under the Maryland long-arm statute. TCA is incorrect in arguing that it "has no duty to identify a provision" of the long-arm statute. (Plaintiff's Memorandum in Opposition to Vanhook's Motion to Dismiss at 36.) Rather, TCA must establish that the long-arm statute applies *before* moving to the constitutional arguments. *See Dring*, 423 F. Supp. at 544 (citations omitted).

Because Vanhook has never physically entered or conducted business in Maryland, TCA's theories about how the long-arm provisions apply to her focus on her use of TCA.net. It is questionable whether any of the long-arm provisions encompass Vanhook's activities. Specifically, with regards to 6-103(b)(1), TCA argues, "The use of a computer by a nonresident defendant to harm a Maryland plaintiff may constitute transaction of any business or purposeful activity." (Plaintiff's Memorandum in Opposition to Defendant Vanhook's Motion to Dismiss at 37.) This argument is not persuasive because Vanhook did not transact business or perform work or service *in Maryland*. With regards to 6-103(b)(3), TCA argues that to obtain TCA's propriety information Vanhook was required to "go into the Maryland database" in a way that is analogous to physically breaking into TCA's office in Maryland and stealing from a filing cabinet. (*Id.* at 38.) This analogy is inadequate. Both the tortious injury and the tortious act must have physically occurred in Maryland for this provision to be applicable. *Dring*, 423 F. Supp. at 546 (finding this provision inapplicable where there was no evidence that the Defendant sent the allegedly tortious email "from Maryland").

TCA's final argument that 6-103(b)(4) is implicated because Vanhook engaged in a "persistent course of conduct in the State" by routinely accessing TCA.net comes closer to being persuasive. Again, however, accessing a Maryland website from some other state does not seem to be a "persistent course of conduct *in the State*." Keeping in mind, though, that the Court of Appeals of Maryland has determined that legislative intent in drafting this provision was "to expand jurisdiction to the limits permitted by due process," *Geelhoed v. Jensen*, 352 A.2d 818, 822 (Md. 1976), it is possible the Maryland legislature intended to include actions such as those alleged here. Therefore, I will proceed to analyze whether exercising personal jurisdiction over Vanhook would violate due process.

## 2. **Internet Usage**

The interaction between personal jurisdiction and the internet is a complex and developing area of the law, but some guidance was provided by the Fourth Circuit in *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002).[8]  In *ALS* the Fourth Circuit addressed the question of "whether a person electronically transmitting or enabling transmission of information via the Internet to Maryland, causing injury there, subjects the person to the jurisdiction of a court in Maryland."  The Court adopted a "'sliding scale' for when electronic contacts with a State are sufficient." *Id.* at 713 (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)).  The scale's spectrum ranges from "situations where a defendant clearly does business over the Internet" to "situations where a defendant has simply posted information on the Internet Web site which is accessible to users in foreign jurisdictions." *Id.* at 713-14 (quoting *Zippo*, 952 F. Supp. at 1124).  The middle of the spectrum "is occupied by interactive Web sites where a user can exchange information with the host computer." *Id.* (quoting *Zippo*, 952 F. Supp. at 1124).  This approach is now widely used—albeit with considerable variation in application—by courts analyzing whether a party that supplies products or information on the internet is subject to personal jurisdiction wherever the website is accessed.  *Shamsuddin v. Vitamin Research Prods.*, 346 F. Supp. 2d 804, 809-10 (D. Md. 2004).  *But see Tamburo v. Dworkin*, 601 F.3d 693, 703 n.7 (7th Cir. 2010) ("[W]e hesitate to fashion a special jurisdictional test for Internet-based cases.  *Calder* [*v. Jones*, 465 U.S. 783 (1984)] speaks directly to personal jurisdiction in intentional-tort cases; the principles articulated there can be applied to cases involving tortious conduct committed over the Internet.").

Here, however, the question is whether a person electronically *receiving* information via the Internet *from* Maryland is subject to personal jurisdiction in Maryland.  This is the reverse of

---

[8] The analysis in *ALS* did not distinguish between the long-arm statute and constitutional due process.

the situation analyzed in *ALS* and *Carefirst*, and it is unclear whether the *Zippo* approach should apply.[9] If the *Zippo* analysis does apply to those who access websites, just as it applies to those who post them, there are three requirements for this Court to exercise jurisdiction: Vanhook must (1) direct electronic activity into Maryland, "(2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS*, 293 F.3d at 714. Neither of the first two requirements is satisfied. Although TCA.net was somewhat interactive, Vanhook's internet usage is more akin to simply posting information (she was accessing posted information) than to "clearly do[ing] business over the Internet" (TCA.net provided support but was not her primary means of conducting business). Thus, if *ALS* is extended to cover situations such as this one, Vanhook is not subject to personal jurisdiction in Maryland.

Rather than applying the *Zippo* test, however, it may be more helpful to look to the Fourth Circuit's purpose in adopting *Zippo*. The Court sought to extend personal jurisdiction based on internet usage in some instances but to avoid extinguishing the defense of personal jurisdiction altogether by making "[t]he person placing information on the Internet . . . subject to personal jurisdiction in every state." *Id*. at 712. In other words, the Fourth Circuit was looking for a way to accomplish the more general purposes of requiring personal jurisdiction while recognizing a State's need to protect its citizens from being harmed through new technology. *See also Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 279 n.5 (4th Cir. 2009) ("The

---

[9] When a party posts a website, it is placing content in a forum that can theoretically be accessed by any number of people in any number of locations. Consequently, it makes sense to use a sliding scale designed to evaluate the extent to which the website owner intended to interact with citizens of a particular state. In contrast, a party that accesses a website is only interacting with that one website owner. The spectrum analysis is consequently much less helpful. Accessing a company's website for the purpose of obtaining information from that company seems more analogous to placing a phone call or sending an email to the company to obtain information. And, as the Fourth Circuit has explained, "the mere fact that emails, telephone calls, and faxes were employed does not, of itself, alter the minimum contacts analysis. The analysis must focus on the nature, quality, and quantity of the contacts, as well as their relation to the forum state." *Consulting Eng'rs*, 561 F.3d at 279 n.5.

fact that the parties used technology to facilitate communications does not ease [plaintiff's] burden to make out a prima facie case for personal jurisdiction."). Based on this reasoning, I find that it would be inappropriate to extend personal jurisdiction over Vanhook on the basis of her internet usage.[10]

### 3. **Effects Test**

A related way Vanhook's contacts with the forum state could be analyzed is through the "effects test," which was created by the Supreme Court in *Calder*, 465 U.S. at 789-90, and embraced by the Fourth Circuit in *First Am. First, Inc., v. Nat'l Assn. of Bank Women*, 802 F.2d 1511 (4th Cir. 1986). *See ALS*, 293 F.3d at 714 (noting that the "standard for reconciling contacts through electronic media with standard due process principles is not dissimilar to that applied by the Supreme Court in *Calder*"). The effects test provides that courts can look to where the "primary and most devastating effects" of a tort were felt for the purposes of finding jurisdiction. *Id.* at 1517. Since adopting the "effects test," however, the Fourth Circuit has begun to require a greater showing. *Cole-Tuve*, 342 F. Supp. 2d at 367 (citing *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)). In a case analogous to the present facts, the Fourth Circuit "held that a New Hampshire resident's collusion with a Florida resident to appropriate the customer lists and trade secrets of a South Carolina corporation, was not so intentionally directed at South Carolina as to warrant an exercise of specific jurisdiction." *Id.* (citing *ESAB Group*, 126 F.3d at 625). In that case the only contact with South Carolina was the colluders' knowledge that a company headquartered in South Carolina would be harmed, so there was no "behavior

---

[10] This case is distinct from those in which an internet user was required to accept specific terms including a forum selection clause in order to access an online database. *See, e.g.*, *Costar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 668-69 (D. Md. 2009) (finding personal jurisdiction over defendants who were required to accept Terms of Use, which contained a provision authorizing all lawsuits to be brought in federal or state court in Maryland, before their first use of plaintiff's online database and periodically thereafter); *Blue Bird, L.L.C. v. Nolan*, No. 302920-V, slip op. at 6 (Md. Cir. Ct. April 28, 2009) (finding personal jurisdiction where defendants consented to a Terms of Use Agreement before accessing plaintiff's website).

intentionally targeted at and focused on South Carolina . . . such that [the defendant] can be said to have 'entered' South Carolina in some fashion." *ESAB Group*, 126 F.3d at 625 (citing *Calder*, 465 U.S. at 789-90). To hold otherwise would result in jurisdiction "depend[ing] on a *plaintiff's* decision about where to establish residence" and "would always make jurisdiction appropriate in a plaintiff's home state, for the plaintiff *always* feels the impact of the harm there." *Id.* at 626. The jurisdictional inquiry must instead turn on "the defendant's own contacts with the state." *Id.*

Here, the effects test does not allow for personal jurisdiction over Vanhook. I am not "satisfied that there are sufficient allegations that the Defendant committed an intentional tort *and* that Defendant intended for that intentional tort to impact Plaintiff in Maryland." *Cole-Tuve*, 342 F. Supp. 2d at 368 (emphasis in original); *see also Dring*, 423 F. Supp. 2d at 548 (applying *Calder* and *ESAB* in the context of harm caused through the internet). TCA's presence in Maryland was entirely irrelevant to Vanhook's actions. *See also Tamburo*, 601 F.2d at 704, 706 n.9 (noting that the Fourth Circuit reads the "express aiming" requirement of *Calder* "narrowly to require that the forum state be the focal point of the tort" and also identifying a circuit split regarding how "to understand *Calder*'s emphasis on the defendant's knowledge of where the 'brunt of the injury' would be suffered").

### 4. Conspiracy Theory of Jurisdiction

TCA also urges this Court to exercise personal jurisdiction over Vanhook under the conspiracy theory of personal jurisdiction first recognized by the Court of Appeals of Maryland in *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479 (2006). Under the conspiracy theory of jurisdiction, much like the agency concept of jurisdiction, a party "may be subject to suit in the forum jurisdiction based upon a co-conspirator's contacts with the forum state." *Id.* at 484. The Court of Appeals found this theory of jurisdiction included within the Maryland long-arm statute

because the provisions apply to a person who commits acts "directly *or by an agent*." *Id.* at 484, 493 (emphasis added); MD. CODE. ANN., CTS. & JUD. PROC., §6-103(b). It also extensively analyzed the due process implications of such an approach, ultimately finding it constitutional "only if the co-conspirator had a reasonable expectation, at the time the conspirator agreed to participate in the conspiracy, that acts to be done in furtherance of the conspiracy by another co-conspirator would be sufficient to subject that other co-conspirator to personal jurisdiction in the forum." *Mackey*, 892 A.2d at 489. Combining this requirement with the standard elements for conspiracy, the Court of Appeals provided four elements that must be satisfied for a court to exercise conspiracy jurisdiction over a defendant:

> (1) two or more individuals conspire to do something (2) that they could reasonably expect to lead to consequences in a particular forum, if (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state . . . .

*Id.* at 486 (quoting *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982)).

Here, only the first two elements are in dispute, and neither is satisfied. First, it is questionable whether TCA has made a *prima facie* showing that Vanhook and the Neuberts engaged in a conspiracy. Under the "intracorporate conspiracy doctrine," an employee cannot conspire with the corporation that employs her. *Baltimore-Washington Telephone Co. v. The Hot Leads Co., L.L.C.*, 584 F. Supp. 2d 736, 744 (D. Md. 2008).[11] This means that any actions taken while Vanhook was the Neubert's manager are not part of the alleged conspiracy as a matter of law. The remaining factual allegations are likely insufficient to satisfy the pleading requirements for a civil conspiracy. What is even clearer is that the second element has not been met. The Court of Appeals emphasized that the second element is satisfied "only if the other co-conspirator reasonably expects *at the time the other conspirator agreed to participate in the*

---

[11] TCA does not allege that either of the exceptions to the intracorporate conspiracy doctrine apply.

*conspiracy* . . . that such acts will subject the co-conspirator who performs them to the personal jurisdiction of the forum state." *Mackey*, 892 A.2d at 489 (emphasis in original). Although all four elements are required, it is this second element that is crucial to making the conspiracy theory of jurisdiction constitutional.[12] TCA has pled that Vanhook knew or should have known that the Neuberts were subject to a Maryland franchise agreement, but there is no evidence that she had any reasonable expectation that she would be subject to personal jurisdiction in Maryland. *See, e.g.*, *Capital Source Fin., LLC v. Delco Oil, Inc.*, 625 F. Supp. 2d 304, 315 (D. Md. 2007) ("There is no basis in the amended complaint or in the affidavits and evidence filed by Plaintiff to support a conclusion that [Defendant] could have foreseen any jurisdictionally sufficient conduct with respect to Maryland at the time he joined the alleged conspiracy."). Consequently, the conspiracy theory of jurisdiction does not provide a basis for asserting personal jurisdiction over Vanhook.

### C. Conclusion

This Court cannot exercise personal jurisdiction over Vanhook because her conduct likely does not satisfy the long-arm statute and definitely does not meet the constitutional requirements. She could not have foreseen that her conduct would subject her to jurisdiction in Maryland and did nothing to avail herself of Maryland law. It is consequently appropriate for me to either dismiss the claims against Vanhook to be filed in a more appropriate location or to transfer them elsewhere myself. *See Dring*, 423 F. Supp. at 549. Because neither party has suggested that the suit be transferred, I will dismiss it without prejudice so that TCA may refile it in another court if it so chooses.[13]

---

[12] As the Court of Appeals noted in *Mackey*, some courts have found that the conspiracy theory of jurisdiction violates due process. 892 A.2d at 492 n.4.

[13] I hereby deny Plaintiff's Motion for Leave to Conduct Jurisdictional Discovery. TCA has "failed . . . to proffer any further facts that it could demonstrate that would be material to the limited jurisdictional ruling. . . . At most, it

### III. MOTIONS TO DISMISS UNDER FED. R. CIV. P. RULE 12(b)(6)

**A. Standard of Review**

Under FED. R. CIV. P. 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard does not require "detailed factual allegations," but it demands more than an unadorned accusation. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading that offers no more than "a formulaic recitation of the elements of a cause of action" is insufficient. *Id.* To overcome a motion to dismiss under FED. R. CIV. P. 12(b)(6), a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Id.* at 570. Therefore, the facts pled must permit the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556.

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). The court is not, however, required to accept unsupported legal allegations. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). In evaluating a motion to dismiss, this court may consider the complaint and "documents attached to the complaint." *Sec. of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). The court may also

---

made some conclusory allegations in support of its request for discovery." *ALS*, 293 F.3d at 716 (citation omitted). I have sufficient information to determine whether this Court has personal jurisdiction over Vanhook, and I do not believe deposing Vanhook, as TCA requests, would alter my analysis.

consider a document the defendant has attached to its motion to dismiss as long as it is integral to the complaint and authentic. *Id.*

## B. Analysis

The Neuberts and the Aldriches have moved to dismiss portions of various counts under Fed. R. Civ. P. 12(b)(6). They argue that the non-compete clause contained in their Franchise Agreements is facially overbroad and consequently unenforceable, so they cannot be held liable for violating its terms. As a preliminary matter, the parties disagree as to which state's law—Maryland or South Carolina—applies to the evaluation of the non-compete clause. They then disagree as to whether the covenant is overbroad and, if so, to what extent this Court has the authority to blue pencil it. As explained more thoroughly below, there is insufficient information presented by the parties at this time for me to determine whether the clause is overbroad. Consequently, the motion to dismiss will be denied, but the issue may be addressed again at the summary judgment stage.

In an action based upon diversity of citizenship, the relevant state law controls. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008). The district court must therefore apply the law of the forum state, including its choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). In contract actions, Maryland courts generally apply the law of the jurisdiction where the contract was made. *See, e.g.*, *Allstate Ins. Co. v. Hart*, 611 A.2d 100, 101 (Md. 1992). In tort actions, Maryland adheres to the *lex loci delicti* rule, meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph*, 529 F. Supp. 2d at 606 (citing *Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 648-49 (Md. 2007)) (other citations omitted).

Parties generally may, however, contract around the choice-of-law rules. The Maryland Court of Appeals "has long recognized the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied by the court." *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007) (citing *Williams v. N.Y. Life Ins. Co.*, 89 A. 97, 99 (1913)). This general rule is subject to two limitations. Maryland courts will not honor a choice-of-law provision if: (1) the chosen state has no substantial relationship to the parties or the transaction, or (2)

> "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

*Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248 (Md. 1994) (quoting Restatement (Second) Conflict of Laws § 187(2) (1989)).[14]

Here, the contracts provided in relevant part that: "[T]his Agreement and the parties [sic] relationship hereunder shall be governed by the laws of the State of Maryland . . . ." (Franchise Agreements § 24.1.) The first rationale for not honoring a choice-of-law clause does not apply here because Maryland clearly has a substantial interest in protecting its businesses. As to the second possible ground for not honoring the parties' choice, while it is arguable that South Carolina has a greater interest than Maryland because the non-compete clause directly affects competition and businesses in South Carolina, this Court cannot conclude on the existing record

---

[14] The Fourth Circuit has omitted a crucial portion of this language—"and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties"—on at least two occasions. *See, e.g.*, *The Hunter Group, Inc. v. Smith*, 9 Fed. App'x 215, 2001 WL 558146 (4th Cir. 2001) (citing *Ciena Corp. v. Jarrard*, 203 F.3d 312, 323 (4th Cir. 2000)). It is unclear why this omission occurred, but this Court is using the language directly from the Restatement, which is what was quoted by the Court of Appeals of Maryland. Consequently, this Court is wary of the parties' reliance on *Hunter*.

that South Carolina law would apply absent the choice of law provision. Section 188 lists several types of contacts that "are to be evaluated according to their relative importance with respect to the particular issue." RESTATEMENT (SECOND) CONFLICT OF LAWS § 188(2)). These contacts are: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* As the Aldriches and Neuberts acknowledge, there is absolutely no evidence on the record as to the place of contracting and place of negotiation. Absent this information, I am unable to evaluate the parties' contacts with each state and determine which state's law should apply.

I am also unable to determine on the current record, regardless of which state's law is used, whether the covenant not to compete contained in both the Neuberts' and Aldriches' Franchise Agreements is overbroad. *Cf. Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007) ("Even if we accept [defendants'] broad reading of the restriction, we cannot determine on the pleadings that it is unreasonable."). Under Maryland law, the evaluation of non-compete clauses is fact specific. *Padco Advisors, Inc. v. Ohdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002). Restrictive covenants in employment contracts will generally "be sustained if the restraint is confined within limits which are no wider as to area and duration than are reasonable for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Id.* (citing *Ruhl v. F.A. Bartlett Tree Expert Co.*, 225 A.2d 288, 291 (Md. 1967)) (internal quotations omitted); *see also Ecology Servs. v. Clym Envtl. Servs., LLC.*, 942 A.2d 999, 1006-07 (Md. Ct. Spec. App. 2008) (citing *Becker v.*

*Bailey*, 299 A.2d 835 (Md. 1973)).[15]  Other factors to be considered include "the interests of the

public, and whether the employee sought to be enjoined provides unique services, is soliciting

customers, suing trade secrets, assigned routes, customer lists, or is exploiting personal contacts

established between the employee and his customers during his employment." *Millward v.*

*Gerstung Int'l Sport Educ., Inc.*, 302 A.2d 14 (Md. 1973).

Under South Carolina law, restrictive covenants not to compete "are generally disfavored

and will be strictly construed" against the contract provider.  *Rental Uniform Serv. of Florence v.*

*Dudley*, 301 S.E.2d 142, 143 (S.C. 1983).  The relevant considerations are:

> whether it is necessary for the protection of the legitimate interest of the
> employer, is reasonably limited in its operation with respect to time and place, is
> not unduly harsh and oppressive in curtailing the legitimate efforts of the
> employee to earn a livelihood, is reasonable from the standpoint of sound public
> policy, and is supported by a valuable consideration.

*Id.* (citation omitted).

Here, the post-term covenant not to compete states that, for two years after the

termination of the Franchise Agreement, the signees will not "directly or indirectly . . . own [or]

engage in . . . any residential or commercial property cleaning business . . . within your Territory,

plus the area formed by extending the boundaries of the Territory 100 miles in all directions . . .

."[16]  First, the parties disagree as to whether "cleaning business" refers to the geographic area in

which the company conducts its business or refers specifically only to the office or headquarters

---

[15] TCA has suggested that non-compete clauses in the franchise context are more analogous to clauses included in the sale of a business than to traditional employment contracts.  This argument, while interesting, was not supported by Maryland case law or fully discussed in the parties' filings.

[16] The post-term non-compete clause provides in full: "For a period of 24 months after the effective date of expiration or termination of this Franchise Agreement for any reason . . . neither you nor the operating corporation nor the guarantors to this Franchise Agreement will, directly or indirectly, for yourselves or for any other person or entity, alone or through or on behalf of others, own, engage in, be employed by, advise, assist, lease or sublease to, invest in, franchise, lend money to, sell or lease the assets of the Franchised Business to, or have any financial or other interest in, any residential or commercial property cleaning business, including without limitation, any carpet cleaning, window cleaning or furniture cleaning business within your Territory, plus the area formed by extending the boundaries of the Territory 100 miles in all directions or within 10 miles of any territory of any of our franchisees in existence on the date of termination, assignment or expiration of your Franchise Agreement." (Section 22.2 of both Franchise Agreements.)

of the business.  Obviously the narrower reading makes it more likely that the covenant not to compete is enforceable.  That interpretation does not seem supported by the contract's language, though.  Furthermore, regardless of which way the contract is read, more information is needed to determine whether the clause is enforceable.  The Court does not know, for example, how far most cleaning professionals routinely travel for their appointments.  If a trip nearing 100 miles is conceivable, the analysis here is far different from if the average travel distance is significantly shorter.  The reasonableness of the non-compete clause is also dependent upon the density of the population in the covered area.  A non-compete clause covering a wide radius is more reasonable in a rural area than an urban one because residents of an urban area are unlikely to hire a cleaning service from as far away as residents in a sparsely populated setting.  Undoubtedly there are other facts that would also influence the analysis.[17]

If I determine the covenant is not overbroad, the analysis will end at that point.  If, on the other hand, I find that the covenant is overbroad, I will need to decide whether Maryland's and South Carolina's laws regarding blue penciling are significantly different.[18]  If they are not, Maryland law will apply.  *Cf. Padco*, 179 F. Supp. 2d at 606 ("Maryland's law is clearly not contrary to a fundamental policy of California[, so] there is no compelling reason to ignore the choice of law clause agreed to by the parties and Maryland law will be applied.").  If they are, I will proceed through a choice-of-law analysis.  *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750 (D. Md. 2003) ("Choice-of-law analysis becomes necessary, however, only if the relevant laws of the different states lead to different outcomes.").  These issues can be more thoroughly addressed at the summary judgment stage.

---

[17] In the most factually analogous case provided by the parties, *Merry Maids Ltd. P'ship v. Kamara*, 33 F. Supp. 2d 443, 446 (D. Md. 1998), a District of Maryland Court evaluating a motion for preliminary injunction held that a one-year, 75-mile non-compete provision would likely be found reasonable under Tennessee law.
[18] Because the 100 mile radius extends into Georgia, Georgia law may also be implicated.

# IV. CONCLUSION

For the foregoing reasons, Vanhook's motion to dismiss is granted, and the Neubert's and

Aldriches' motions to dismiss are denied.


Date:  September 7, 2010      /s/_____

                                                J. Frederick Motz
                                                United States District Judge